[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a case in which the plaintiff husband is suing for dissolution of a marriage of some 14 years. The defendant CT Page 5342 I wife has filed a cross complaint seeking a legal separation.
The parties were married in February of 1977, seven months after the death of the plaintiff's wife and one year after the defendant's marriage ended in divorce. At the time of the marriage the plaintiff was 47 years old and the defendant was 46. There are no children issue of this marriage. Both parties have lived in this state for at least one year prior to the institution of this action. Neither party has been a recipient of state, local or federal aid.
The reason for the parties' marrying in February of 1987, a relatively short time after the death of the plaintiff's wife in August of 1986, was the plaintiff's desire to room with the defendant on a trip to Europe which the defendant had previously planned with other people. While the plaintiff was offered the opportunity of rooming with a male member of the party, he rejected that and insisted on sharing a room with the defendant. The defendant was unwilling to do that unless they were married. Consequently, the plaintiff and the defendant were married in February prior to the European trip in 1977.
The plaintiff went ahead with the marriage despite the objections of his two daughters, one 20 and the other 16, who felt it was too short a time after their mother's death. In addition, the plaintiff, a month after his wife's death, sold the marital home and bought a condo in Oronoque for himself and his two children. However, once marriage plans were made, he told his children they would have to move out of the condo because he and his new wife would be living there.
At that time there was considerable hostility towards the defendant who must have been seen by the plaintiff's children as the cause of their father's actions. The hostility was principally between the older daughter and the defendant, with the older daughter refusing to congratulate the defendant on their engagement or marriage.
Despite this somewhat rocky beginning, the marriage appears to have been a relatively happy one. Pictures of the parties on vacation and with friends and cards sent by the plaintiff to the defendant for various holidays all attested to that fact. The plaintiff's claim now that, in fact, he thought right after they were married that he had made a mistake appears less than credible in light of the activities in which they engaged throughout the marriage. They lived in a very comfortable lifestyle, taking vacations in Florida and in Hawaii, Hilton Head, etc. They also entertained from time to time and enjoyed being entertained at their friends' houses including the defendant's sister and brother-in-law. CT Page 5343
While there were incidents of disagreements, of arguments or concerns, sometimes about their sexual relationship, sometimes about their relationships with the daughters, these were not constant. In fact, it came as a shock to not only the defendant but also to her sister and brother-in-law when they were called to the house by the defendant and told by the plaintiff that he was asking the defendant for a divorce. There had been no prior discussion of divorce and this announcement came as a kind of bombshell with the further statement that papers were going to be served the next day.
Moreover, while there were times when there was hostility between the defendant and the older daughter, there were also times when there was a friendly relationship, particularly after the older daughter had a baby. However, that broke down in 1987 when the older daughter accused the defendant of being in part responsible for the younger daughter's having severe emotional problems which required hospitalization. That daughter, Laurie, had been living with the plaintiff and the defendant in their condo from shortly after the marriage. The older daughter had been living outside the condo throughout the marriage and had married and had a child in the interim.
However, whatever the cause of the hostility, there seemed to be no attempt on the part of the plaintiff to ameliorate it in anyway. There was some evidence that the older daughter would complain to the plaintiff about the treatment that Laurie received from both of them, her father and his wife, in their home. Following these complaints, the older daughter said that the situation would improve but then would deteriorate in her opinion. This would seem to suggest that the plaintiff had some ability to make things better but only exercised that ability after complaints and then for a limited period of time.
Whatever the problems with the daughters, the fact is that there was no attempt on the part of the plaintiff to take any steps to end this marriage until July of 1990. The reason for his taking action in 1990, in the court's opinion, was his relationship with another woman who worked with him. That relation had begun in 1988 when, following the death of her husband, the plaintiff had gone to offer his condolences the day after the husband's death. He did so without asking his wife to accompany him.
Thereafter, he appears to have seen her off and on and had her to dinner at his home with his wife. In 1990 he spent some time with her trying to help her buy a car. Thereafter, she drove him to work even though his wife was willing and able CT Page 5344 to do so. On one such occasion, the other woman, whose name was Mrs. Donofrio, came in for coffee at the marital home. The defendant remarked to the plaintiff that evening that Mrs. Donofrio seemed to have the "hots" for him. His reply was, "Well, maybe I should follow up on that."
Furthermore, following the filing of the divorce papers, the plaintiff visited a motel in Wethersfield with Mrs. Donofrio and spent the night with her.
While the court does not feel the evidence requires a finding of adultery, it certainly confirms the court's conclusion that the reason for the breakdown of the marriage was that the plaintiff found somebody else who was several years younger than he and who apparently appealed to him more than his wife.
Under these circumstances, the court cannot find that the breakdown of the marriage was caused by any of the myriad incidents recited by the plaintiff nor by the hostilities between the defendant and his daughters. None of the incidences in question seem to the court to be of any real consequence and amounted to nothing and were tolerated until the time that the plaintiff wanted out in order to continue a relationship with another woman, and the court so finds.
The court finds that the cause of the breakdown was the plaintiff's conduct in seeking to continue a relationship he had established with another woman.
Against this background, the court must make its determination of the amount of alimony to be awarded as well as how the marital assets should be distributed. The cause of the breakdown is one of the factors to be considered in addition to the other factors set forth in 46b-81 and 46b-82 of the General Statutes.
At the time that the plaintiff began courting the defendant, she was living in an in-law apartment in her sister's house and was working at St. Vincent's Hospital coding records. She worked full time, five days a week. She is a registered nurse but has not had any additional training during her marriage of some 13 plus years. She had assets in the amount of $12,000.00 which had been realized from the sale of her former marital home and that amount was invested in bonds which now are worth $38,000.00. She also had a car and some furniture. After the marriage she ceased working by mutual agreement and performed the duties of housekeeper and wife full time. She also cared for the plaintiff during his illness resulting from a heart attack. The plaintiff's daughter, Laurie, lived with them CT Page 5345 in the condominium and is presently still living there.
The plaintiff, on the other hand, at the time of the marriage was working for Sikorsky. He owned the condominium which he had purchased following the sale of his former marital home and he had an Oldsmobile as well as the furniture in the condo. At Sikorsky he had a pension plan along with other benefits provided by Sikorsky including health and life insurance. His savings plan appears to have begun with his marriage to the defendant.
At the present time, the defendant is not working. She has a half interest in the condominium which was given to her by the plaintiff I think in 1987, and she has some bonds, 18 Series E bonds, in the name of herself and her husband and 20 Series E bonds also in joint names worth a total of $38,000.00. She also has six Series E bonds joint with her husband in the amount of $500.00 and four Series EE Savings Bonds payable on death to her granddaughter, Jennifer Marquitich, in the amount of $1,800.00. She has savings in the amount of $6,400.24, Christmas Club in the amount of $800.00, and a checking account in the amount of $64.78. Her affidavit lists some expenses. This includes rent, mortgage and real estate taxes which she is not paying now because the plaintiff is paying under a prior court order of temporary alimony pendente lite. Her only source of income is really the alimony at the present time.
While she is a registered nurse, the defendant's training was in the 50's, and she has not taken any courses to bring her knowledge up-to-date. In addition, she did help to nurse her sister who was in the hospital during the course of this marriage and hurt her back in so doing. As a result of the injury to her back, she has a number of limitations on her activities which are set forth in exhibit 44 which is a "Physical Capacity Worksheet." This limits her lifting ability to 10 lbs. occasionally, her ability to stand daily with a break every two hours for four hours, and to sit daily with breaks for four hours, and to walk daily without restrictions. In addition to these restrictions, her age would be an impediment despite the laws against discrimination because of age. She is presently 60 years of age. Consequently, it would seem that her 3 maximum capacity to work would be at some part time employment at a little above the minimum wage.
Another consequence of both her age and her injury is the problem of obtaining health insurance. At the present time she is insured under her husband's coverage with Sikorsky for which he is paying. CT Page 5346
The plaintiff is presently the head of the Department of Intellectual Properties at Sikorsky. His earnings as set forth in his financial affidavit are over $100,000.00 a year. His assets which were not completely set forth in his affidavit include: the value of the condominium in which he has a one half interest. He has progressively decreased the value of that condo from $250,000.00 in August of 1990 to $180,000.00 in January of 1991 to $160,000.00 in February of 1991. He has a pension plan which was valued by expert testimony at $322,000.00. He also has a deferred savings account in the amount of $117,665.00 and a savings plan of $79,027.00. In addition, he has IRAs of $17,369.00. According to his affidavit, he only gave a total of $117,665.00 as the value of all his assets. In fact, given all of the above, they total $525,000.00 in addition to the $117,665.00.
The only liabilities the defendant has are her counsel fees and the expenses of this case. The plaintiff lists as a liability a loan which was deducted from his pension and which decreased the value of his pension but is not actually a liability of his. See exhibits 7, 8, 9 and 10.
The savings plan began in July of 1978; that is, after the parties married. The pension or his right to a pension began when he started to work for Sikorsky in 1961. (See letter from Diane Hagelthorn of United Technologies/Sikorsky Aircraft to Attorney Serge Mihaly in response to a subpoena of January 17th, 1991, exhibit 7.)
The plaintiff also has a 1990 Lincoln Continental, furniture in the condo which he bought prior to the marriage, and an interest in the furniture which he and the defendant bought during the marriage.
While the plaintiff is 62 years of age and already eligible for retirement, there is no indication that he plans to retire soon. Should he retire, he is entitled to a pension of some $3,000.00 or more a month under one of the options he may elect. Because of his position with Sikorsky, it would appear that he has the ability to acquire other assets. However, given the ages of both parties, the ability of each to acquire other assets would seem to be somewhat limited. Of the two, however, it is clear that the plaintiff has by far the greater ability to acquire future assets and to earn substantially more income than the defendant.
The plaintiff does have a heart condition and was hospitalized in 1987 as a result of a heart attack. He appears to be in good health now although he must take medication for his heart. CT Page 5347
The court has considered all of factors set forth in46b-81 and 46b-82 as well as the evidence presented and makes the following findings and orders:
1. The marriage has broken down irretrievably with no hope of reconciliation, and it is hereby dissolved.
2. Both parties have resided in this state for more than one year prior to the institution of this action, and the court, therefore, has jurisdiction thereof.
3. Neither has been the recipient of any city, state or federal aid.
4. There are no minor children issue of this marriage.
5. The cause of the breakdown is set forth above.
6. The plaintiff is ordered to pay the sum of $700.00 a week as alimony to the defendant until she remarries, cohabits or dies.
7. The plaintiff shall also provide the defendant with the same medical health, hospitalization insurance she presently has through his employer but at her expense for so long as the company permits him to do so or until the defendant obtains similar insurance for herself. The defendant, however, shall be responsible for the expense of this insurance whether provided by the husband's company or otherwise.
8. The defendant is entitled to one half the two savings plans presently in the plaintiff's name. The plaintiff shall, therefore, pay the defendant a sum equal to one half the value thereof as of January, 1991 (his contributions having been stopped as of September, 1990) in the amount of $98,341.00 not later than thirty (30) days following the entry of this judgment.
9. The court finds that the defendant is also entitled to .433 per cent of one half of the plaintiff's pension at its present value (13 years of marriage divided by 30 years representing the duration of the pension plan to the date of the trial), and the court will sign a Qualified Domestic Relations Order to put this into effect. Counsel for the defendant shall prepare the QUADRO for this purpose.
 In the alternative, instead of receiving her interest in the plaintiff's pension by a QUADRO, the defendant may CT Page 5348 elect to receive 43 per cent of one half of the pension or $34,356.50. The defendant shall make this election within two weeks following the entry of the judgment in this matter.
10. The defendant is also entitled to her one half interest in the condominium which is the marital property. The court finds the value of the condominium to be $180,000.00 and orders the plaintiff, at his option, to do one of the following:
 a. Provide the defendant with a mortgage in the amount of $82,550.00 (one half the value less the mortgage) at eight (8%) per cent interest payable monthly amortizable over thirty (30) years with a balloon payment of half the amount due in ten (10) years; or,
 b. a cash payment in the amount of $82,550.00. In either event, upon the receipt of the mortgage or of the cash, the defendant shall convey to the plaintiff all her right, title and interest in the condominium; or,
 c. the plaintiff may sell the condominium and divide the net proceeds equally between the parties (net meaning the gross purchase price less the agent's commission, attorney's fees, current taxes and mortgage and closing costs); or,
 d. upon receipt from the defendant of a cash payment in the amount $82,550.00 or a mortgage in that amount with eight (8%) per cent per annum interest payable monthly, amortizable over thirty (30) years with a balloon payment of half the amount due in ten (10) years, the plaintiff shall convey all his right, title and interest in the condominium to the defendant; or, e. should the plaintiff opt to sell the condominium, the defendant shall have the option of purchasing the plaintiff's interest for $82,550.00. In the event that she does not wish to purchase that interest, the sale shall take place within six (6) months from the date of the first announcement of its availability. The price shall be set by agreement of the parties or, if they are unable to agree, by a real estate broker selected by them, and if they are unable to agree on any one broker, then each shall select a broker and those brokers shall select a third broker who will set the asking price and the eventual sale price.
11. Plaintiff shall also contribute to the defendant the sum of $10,000.00 for counsel fees and court costs. CT Page 5349
12. All of the savings bonds now in the wife's possession as listed on her affidavit shall be the defendant's solely, and the plaintiff shall take whatever steps are necessary to remove his name therefrom.
13. The defendant shall have sole title to the 1986 Oldsmobile, and the plaintiff shall have sole title to the 1990 Lincoln Continental.
14. The defendant shall keep all the furniture she came to the marriage with, all the jewelry, gifts and apparel. The plaintiff shall keep all the furniture and jewelry he came to the marriage with. The furniture which was acquired by the parties during the marriage shall be divided equally between them. If they are unable to reach an agreement, they shall consult Family Relations, and the court shall retain jurisdiction to act upon the recommendations of Family Relations.
15. The plaintiff shall hold the defendant harmless for 1989 and 1990 income taxes; both parties to file separately.
16. The defendant shall keep the IRAs and bank accounts listed on her affidavit in paragraphs 4D, E, F and G.
17. The plaintiff shall keep his IRAs and bank accounts listed on his affidavit.
18. The plaintiff shall keep the proceeds of the bonds that were in joint names that he cashed ($18,500.00).
19. A contingent wage execution shall issue.
Judgment shall enter in accordance with the above.
MARGARET C. DRISCOLL STATE TRIAL REFEREE